You may call the next case. Case number 166291, United States of America v. Michael Brown. Oral argument not to exceed 15 minutes per side. Mr. Little for the appellant. Good morning, your honors. Alex Little on behalf of the appellant defendant Michael Brown. I'd like to reserve five minutes for rebuttals. Chief Judge Cole, if that's permissible. Yep, that's fine. May it please the court. As you're well aware, Mr. Brown has raised three issues for his appeal, two relating to the trial and one relating to the sentence. I appreciate very much the court's pre-argument order with respect to those issues, directing us to three particular questions. So I want to jump to those at the beginning of the argument. The first relates to what was the actual obstructive act the district court was focused on to find the enhancement under 5C. There are four places in the record where discussion takes place about that act. 1461 to 65, 1645, the exhibit of the email itself, which is app 209 and 210, and the PSR, which is PDID 2073. Those are the only places encompassed in the record where these obstructive acts are described. And it appears very clear from the way that the sentencing judge discusses them that he is focused on the subsequent email with names and not on the mere statements made by Mr. Brown in the actual proffer with the United States government. The testimony or the record about the proffer is really limited to vague testimony by two agents, no testimony by the defendant, but testimony from two agents that he was there. He kind of said there were other people who had access. When asked to describe them, he said he didn't know their names. They were two African-American males. That's the extent of the record evidence about that act. There is no record evidence. Was there understanding between you and the AUSA whether the two African-American men were supposed to be in the list of the eight? Are they separate? What's your take on that? So let me answer that question two ways. One is I was not the trial attorney. We have a difficult issue here in that the trial attorney became a magistrate judge over the course of his appeal. He no longer has the case, obviously. I think the presumption was that the way that that email is framed is on its face at App 209 for the government is that he was attempting to name the people who generally had access to the computer, which was a topic that came up at the proffer. Separate from the two African-Americans? There's never anything in the record that makes me think. I think there may have been a presumption. Well, he mentioned that he didn't know who they were and they were two people. He later gives us a list of names. Those might be connected. But I think the caveats in that email make it very clear that we have both Mr. Brown's wife and Mr. Brown coming up with names of people who were in their house. Let me make sure I'm clear. My reading of the record is that there are the eight names, some of which were supplied by Mr. Brown's wife and some supplied by him. Then I thought the two African-American users were different from the list of eight. But you're saying there may be some connection? No, I'm saying I don't think that anyone ever took the time or the focus to make that connection clear, particularly because the record is about Mr. Brown saying I don't know who these people were. I don't know them. And so for him to then be able to produce a list with names of who they were I think is a little bit incongruous. I think that he came up with what may have just been a vague description. I know some people were there. I don't know who they were, and that's what the record evidence says. But that goes back to the wife adding names. The wife could have known their names but not him. Sure, but I don't think that then creates an obstruction of justice for him. No, I'm not saying it undermines. I'm just trying to figure out what we're pointing at. I think – so that moves me kind of to the second and third questions that the panel has posed. I don't think there's really any record evidence on the question two as to whether the judge believed he was talking about those particular people or not. I think the judge was treating this entire series of events as an act, starting with the proffer, ending with the email, and describing that as sort of a one act of obstruction that he found to be, I think, in his colorful description, running the rabbit across the trail of the prosecutors. But I don't think because particularly that's one of the issues that we've raised and how we've raised it, there's anything in the record that you could rely upon to say that there was a false statement that obstructed justice significantly. There's absolutely nothing in the record to suggest that the FBI agents who were there for the proffer took the time to look for unidentified African American males in his neighborhood or who had connections. There's a statement in the record that Mr. Brown had said those people appeared to have access to Facebook, that he had let them use the computer, and those two individuals who were unnamed used Facebook. There's nothing in the record to suggest that the government went out and subpoenaed Facebook for the login information that day to see what users would have logged in or anything of that sort. The entire focus of the government's effort appears to be the eight names in that email that they then went out, interviewed, and called to testify. So you would agree that the government, that the district court, if you read its statements in sort of in context, said that the eight people who were identified on this list caused the government to expend time, resources. They had to be called to come in and testify and deny that they either had access or used the computer. There wasn't – go ahead. I think the government certainly did something in response to those names. I think that it falls within Williams in terms of post-investigative trial preparation and not so much in somehow impeding their actual investigative function. I also don't know that those names were false statements or that they were made by Mr. Brown. I mean I think that they were made by Mr. Brown's lawyer. They were explicitly stated to be individuals with access to his computer or access to the home even. And when they testified, the individuals generally said they had been to their home. I think all but two said they had been to their home. It was unclear if those two were the names provided by Mr. Brown's wife. So I don't know that – But it was clear that they were provided by the wife actually. Those two, yes. I think – I apologize. So she's the one, the four at the top. You got me wrong. Yeah, and I got this confused today looking at it, and I apologize. The four names at the top that are handwritten were the Mrs. Brown names. The four typewritten lists were the Mr. Brown names. And the two people that testified that I wasn't even in the house, they were among the handwritten? Two of the wife's names, I believe. And I think there's also a question, which I haven't seen a case upon, where an attorney representation via email to an assistant U.S. attorney in the context of this sort of situation where there's been a proffer, is this a 408 negotiation? What exactly is the context of this communication? Is that an obstructive act for purposes of 5C? The government didn't argue that it was. I think I noted in our initial brief and also in our reply brief that these were not statements of Mr. Brown. And then to then use his lawyer as an agent for obstruction I think raises a whole host of questions. There is testimony from the lawyer at trial, but I don't think based on that lawyer's – Is there a case that says that? I could see that case being out there, that as long as you communicate this through a lawyer, you can't get the client for obstruction. I haven't seen that case, Your Honor. And it may exist. It's certainly not one that I found in looking at this issue. But I think we're still helped by the fact that it's not actually false. And in false statement cases, there is certainly an emphasis on whether or not the statement itself is false or just simply misleading. And I think here because of the difference that the guidelines make between a false statement with significant obstruction or a false statement itself, there is some play in the guidelines for recognition that individuals may not be entirely forthcoming in their interactions with the government. But the failure to be entirely forthcoming does not require the judge to enhance that by two points. And I think at the end of the day on that issue, the firmest position that we stand upon is there's just not record evidence that this court can look on to say the government has met their burden. That the court found by preponderance there had been significant obstruction tied to a statement of Mr. Brown that was actually false. With respect, and I'm happy to answer other questions on that issue, and I hope that that clarifies. Let me make sure I'm getting the falsity thing. I think I am. The reason it's not false is that these eight people did have access to the computer. That's all that was said. And I apologize. I can pull up the exact email.  I remember. But that's the point. That is the point. And I certainly don't think that 5C. 5C is explicitly not meant to include statements which may be. This goes back to the Braunston perjury line of cases when you have to have specific falsity and sort of general falsity or general misleading nature of things. I think here 5C is meant to actually talk about actual false statements and not merely ones which may be incomplete or purposefully vague. Does that answer your question, Judge Sutton? Yes, thank you. With respect to the other two issues, I want to address, I think most importantly, the issue of juror questioning. Juror questioning is an issue that has, I think, bedeviled courts of appeals across the country. Every case that you will see indicates that courts of appeals disprove this practice. This court in Collins adopted that same disapproval. I recognize that it did so in the context of upholding the practice. But here we have a judge who admittedly is out of district because of the sort of judicial issues that you talked about in the last case and the five-year delay. They were bringing judges in from out of the district. He was a senior judge from Arkansas. But apparently as part of his regular practice, he allows jurors to question witnesses and to do so without any discussion of the facts of the case with the lawyers as to whether that's appropriate. Without respect to any sort of examination of whether this is the type of case where juror questioning may be more prejudicial or more probative than any other particular case. Without providing any final instructions to the jury about those questions. And without explaining to the jury really the process or why there might be questions which were unanswered. Doesn't the record reflect here that the district judge took most of these Collins precautions? Notified the parties on a week or two beforehand that he would permit juror questioning. I think before the actual questioning had some sort of – I guess he actually sent opening instructions of some sort. Gave counsel a chance to object. I'm sure counsel never did. I think there's two questions within that that I want to examine. The first is there are about five or six Collins precautionary measures. He adopted two of them or three of them but not all of them. With respect specifically to the notice to counsel, I raised this in my reply brief. There was an attachment made in the district court on a hearing – on a post-appeal submission that included an email from trial – apparently to trial counsel. He was copied on it from the law clerk of the judge. It is not in the record in any way prior to the appeal, and the government did not attempt to expand the record in some way under Rule 10 to make that email part of the record. So I think it's our position that as the court stands here today, the presumption is that that – there is at least an absence of that. And I can't proffer to you one way or another whether the trial judge who is now the magistrate, Judge Frensley, responded to that email, whether he received that email, whether he did anything about it. What we know – It's not in the record. It's not in the record. What we know is that he comes out and gives an initial series of instructions to the jury. I will concede that Attorney Frensley could have stood up at that point and objected to the practice. He did not do so. I think – I hope this court recognizes that it puts the judge and the attorney in a very difficult position once the judge has announced that jury questioning is going to take place, and it does – and the attorney then objects. So I don't know that that prong one way or another particularly helps or hurts our case because I think the record is very muddy. He certainly did not provide any final instructions to the jury about what to do, and he did not explain to the jury why some questions might be proper, why some other questions might be improper. Here, what I think separates this case from the cases in the Sixth Circuit is the demonstration of prejudice. There is not a single question by the jury until Michael Brown takes the stand, not a single one. On day one, no questions from the jury. Day two opens up, and it's going to be the end of the government case and the start of the defense case. And Judge Wilson says, oh, jury, I just want to remind you. You haven't asked any questions yet, but you can ask questions if you want. Mr. Brown takes the stand, and they propose I believe eight separate questions. That posture where the jury has sort of waited to get the explanation, I want to hear did this guy do it or not. And the way these questions are framed are about his alibi. They're about his defense. How many were asked of the eight? Of the eight, I believe half, and I can point you to – Or maybe three. It may have been three. I can point you to that as well. Why is it so prejudicial that they would want to ask eight? I mean, why is this prejudicial? Prejudice of the non-asked questions is because the prejudice is not necessarily the questions that are allowed to be asked, and the judge hopefully would bar improper questions. Maybe they would just be thinking about those anyway, right? I mean, it's not like their brains are turned off until it's question time. I think, Judge Ketledge, that goes directly, though – Hopefully. You'd be surprised in some trials. I think that question, though, goes directly to how there is or is there not a change in the juror's perspective of their role when they know they're allowed to ask questions of witnesses or not. So it may be that a juror who sits through a trial has those sorts of questions in their mind and says, I wonder about this and I wonder about that. I suspect, and I think the panel can certainly suspect that that happens. The question is, when the judge tells you that you're going to play a role in sussing out the answers to that question, does it change your position in such a way to undermine the right to an impartial jury trial? How? Because I think the judge would tell you as a jury, don't make any conclusions. Listen to the evidence, and the government bears the burden. How is – and you can ask questions inconsistent with any of that. I think it tells the panel – excuse me, it tells the jury, you should find out whether or not this guy is guilty through your questions, through your inquiry. It moves the burden from the government's role of putting forth evidence, of the defendant being able to be silent, to having to respond to the questions of the jury. He did. But I think that there's a difference between saying I'm going to testify and take questions from the government or I'm going to testify and take questions from the individuals who were before me and are going to ultimately determine my guilt. I mean I think, Judge Kellett, I won't run away from it. It is exactly your point that is the issue about jury questioning. And I think the panel on the circuit, some circuits, particularly the Judge Lay opinion, Eighth Circuit opinion, I believe it's in Johnson that's a concurring opinion or dissenting opinion, talks about why that is such a problem and why it's a change. And I think ultimately that's the fundamental philosophical question of that issue. I know you say in your briefing that it's a pretty simple case, two-day trial, whatever it was. But there was a fair amount of complexity here when it comes to trying to figure out how, you know, chase down these text links and the servers and the TOR and the pastebin and four-shared and how all that fit together. And could the computer, the server be accessed from outside the home or just inside? So, you know, it might be one of those cases where, you know, it's at her discretion that it be appropriate for jurors to ask sort of technical questions so they understand that complex sort of computer side of the case. Does that make sense? It does make sense. And I think I'll say certainly if the judge had done any of that analysis, maybe it would be in the record and we could turn to that. As a second point, though, the majority of the questions did not relate to sort of technical pieces. A few of them did, but generally they are more broad, talking about alibis and things of that sort.  Thank you. You'll have your full rebuttal time. Thank you. Thank you. I appreciate it. Good morning, Your Honor. Byron Jones, representing the United States in this case. I also would like to begin by addressing the questions posed by the court regarding the obstruction enhancement. I believe the district court considered both the statements at the meeting with agents and representatives of the government as well as the list of eight names that was supplied in the email the following day. Tell me how you react to this approach to that problem. So you have the two African-American males. It is confusing as to what's going on, and the district court is not very clear about this. And all ten conceivably count as rabbits across trails. But as I understand it, there's no evidence that the government pursued the two African-American men. They didn't start searching for people that maybe met this description or tried to get a better description. So I'm really struggling with why that did much of anything. So that makes me think the only way you can justify the district court's decision is the eight. And it is bothersome to me that it's pretty carefully done. I mean, you know, this is actually working with the government. That was their theory of the case. They're allowed to have a theory of the case. It says this is not meant to be exculpatory. We have the wife participating in at least half of them. No one's proved that it was a lie in the sense of these eight people didn't exist and didn't have access. So I don't know, I found myself really wondering whether this was appropriate. There are a lot of questions there. Let me try to answer all of them. First of all, you know, between the time of the meeting. Shouldn't we be focused on the eight? I think you have to focus on both. I mean, it was Mr. Brown's statement at the meeting that he had actually seen two people. We don't know whether it's false or not. The government didn't do anything to track it down. I think it is false. How did it impede or obstruct if they didn't follow up on that in a significant way? Well, there were only 28 hours that elapsed between that meeting and the eight names. There was very little in the way of leads to go on at the time of the meeting. How did it impede or obstruct? Well, once he provided the details to, I submit, clean up the mess that he made at the meeting, realizing that, you know, a very incredible story. Did the government even say, okay, I just want to know, does the list of eight include the two African-American males? Did the government ask the lawyer that question? It's not in the record, but I did ask the lawyer by e-mail the following day. It's not in the record, so there's nothing there. Okay, so that makes me think it's the eight. Well, I mean, we obviously believe that the eight would include the two men that he referenced. There are four names that are attributed to his wife. But he says he doesn't know the names. Right. He did not know the names, arguably. So your theory is the wife supplied? Yes. These are two of the other four. All right, well, I find that that's even more hurtful to your theory. So it is just eight. It is just eight. All eight are listed in the e-mail, and the e-mail says this is not meant to be exculpatory. Yes, sir, but it really is exculpatory, meant to be exculpatory. Just by putting that statement in there doesn't change the government's obligation to investigate these claims that third parties were accessing Mr. Brown's computer. These people, what's the proof that it was not live that these eight people didn't have access to the computer? They all testified they did not use his computer. There was evidence that his computer was password protected. I thought maybe I don't have the e-mail in front of me. I thought it was access to the computer. The statement was they all used the computer? Ready access to Mr. Brown's computer. And in the context of this, this is an explanation of, you know, we confronted Mr. Brown at the meeting with the fact that three of the thumb drives, the three thumb drives had been connected to his computer within days before they were distributed to PricewaterhouseCoopers and to the two political party offices. His explanation for that and our prompting was that he had seen two African-American men, whose names he didn't know, using his computer. He couldn't provide or wouldn't provide any other details about the circumstances of that, and we submit it's pretty incredible to claim that two strangers are using your computer and you make no inquiry, make no police report, make no explanation of who those strangers are in your home. Let's say it was a lie. I mean, U.S. v. Carter, lies to investigators standing alone would not ordinarily warrant an obstruction enhancement unless they significantly obstructed or impeded. So let's say it was a lie. Yes, sir. Where is this significant obstruction or impeded on this record? That lie leads to him providing the eight names. How do we know that? I mean, that seems like… It happens within 28 hours, Your Honor. He, his lawyer… Well, okay, and then so what significant impediment or obstruction then does the eight names cause? Well, then we're obliged to go find those folks, interview them. Yes. When people are being, you know, looked at for crime. Yes, sir. So what was the impediment to the investigation, not just the investigation? Well, Your Honor, he implicated eight people, all of whom had nothing to do with this crime. The jury found him responsible for this crime. He said that they had access to his house. To his computer, Your Honor. To his computer, right. Not just his house. He didn't say these people had access to my house. He said these eight people had ready access to my computer. Now… So what? Go ahead. That can mean they walked by the room. Well, in the context of this inquiry from us, who could have plugged in these three flash drives, in that context, it's clear he's telling us that we need to, that he's going to assert that these people could have committed this crime using his computer. Did the four names that he gave, did those folks at trial say they did not have any, not have access opposed to actually access? I mean, did they say they didn't have access? Access to the computer? Yes. They all said, every one of them said, we've never used his computer. That's not my question. Access is different from use. Did they say they didn't have access? I don't quite understand. I mean, they're in the same house. Six of them are in the same house. There's a difference between being able to walk to the computer and use it and actually using it. My question is, did they say they could not, so to speak, walk to the computer and use it? Well, they said they never used it. Now, I don't know, and the other proof was. I want to wrestle about this kind of basic distinction. Did they speak to whether they had access? If you can just give me a yes or no on that. They testified, right? They testified. Did they speak to this issue, whether they could access it as opposed to used it? They did not, but the proof was that the computer was password protected at the time that the search warrant was executed. So I guess, I mean, I'm struggling to see what the impediment is here. I mean, let's say, I mean, he might have been truthful in saying, okay, well, these people had access. You might want to check that out, okay? How is that, how is his provision of those names a substantial impediment? That's just, I'm struggling with that. Yes, sir. Your Honor, had we not gone and found those eight people, had we been unable to find those eight people, this would have been part of his defense that someone else could have done this. He sent us after people who had nothing to do, sent us to interview people. Is this seeking an investigation or, I mean, this is like trial strategy we're talking about. Well, Your Honor, he's in anticipation of trial. As the district court portrayed it, gave us these eight red herrings, required the agents to go interview these eight people who had nothing to do with this. If you accept the jury's verdict, he knew they had nothing to do with this. Why did it help you? It did help us in the end. It did, but that wasn't his, this statement was false. No, it wasn't false, number one. Number two, it helped you. He was going to testify, he was going to deny it, and a way of seeming to bolster his credibility is to say there's eight other people that have access. The government should have said thank you because we're going to put every one of them on and they're going to say I don't know what he's talking about. And look, you got your conviction. That's obstruction of justice? Boy, you should be asking for more of it. Well, Your Honor. It was helpful. It ended up being helpful. It could have easily not been helpful had we not been able to find any one of those eight people and had not been able to produce all eight people at trial. Aren't those pretty good questions? You said there were eight people. Who are these people? It turned out that way. But if we had not been able to locate any one of those eight, had not been able to compel their testimony at trial, it would have left a hole in our proof. That was the defendant's aim here was to set up a gauntlet of evidence that we had to track down in hopes that we would fail. And in the end, he would have someone else to point a finger at. If the conclusion is that the eight don't work, the two don't work, whether part of the eight or not, does that mean the obstruction of justice enhancement has to be reversed and that at resentencing there's no obstruction of justice enhancement? I don't think so, Your Honor. This was one of five separate arguments we advanced at sentencing of acts by the defendant that we considered. I saw that in the PSR, but did you urge that at the hearing? We urged all of them, Your Honor. The district court expressed his reluctance to base an enhancement decision upon the defendant's testimony at trial. So are you saying he rejected the other? He didn't rule upon them, Your Honor. He just was reluctant, I see. Yes, sir. Okay. And so in our view, we had no choice but to run down these eight people that the defendant, in the context of his statement to us at the meeting, identified as people that, and respectfully, he said they had access to his computer. Six of them said they'd been in the house. The proof was from Mr. Brown that his computer was not password protected, but in rebuttal the agent who executed the search warrant testified that it was password protected. And so simply being in the house, we submit it's not true that they had access to his computer simply by being in the house. Certainly it wasn't true that they'd ever accessed his computer. And so we believe that the district court, there was sufficient evidence to support, by preponderance, the district court's conclusion that the defendant's claims at the meeting, coupled with the email that states, you know, his email's attached, it says that the four names from his spouse I provided you yesterday, all of these names came from the defendant. Is this not in the record? This is in the record. Okay. There was some email that wasn't in the record, right? Because I just personally don't want to hear it. This is Exhibit 63. Okay. Very good. Thank you. I'm sorry to interrupt you, sir. Go ahead. That the district court was correct to apply that. Well, I don't mean to interrupt the point you were making. I just thought we were getting off the record. I'm not sure what I was just making the point that these I'll just stop talking. I'm sorry. These eight names I apologize generally and I'll stop. were provided to Mr. Romer by Mr. Brown. The four from his wife came through Mr. Brown to his attorney and are submitted by his attorney, we submit with his authorization, and that Mr. Brown ought to be held accountable for those eight names. If I could switch, if there are no further questions on that, to address the issue of the juror questions. The district court did follow the advice in Collins. There was no objection to the practice of juror questions at the time. It was not plain error for the judge to conclude that this was a case that was appropriate for juror questions. It involved a number of issues, as Judge Cole pointed out, involving Bitcoin and the use of TOR, evidence recovered from unallocated space, registry records from the defendant's computer. The defendant raised issues about the use of capture to prevent automated post-pay spend. There were questions about whether someone else could have infiltrated the network. All of that supported the district court's decision that this was an appropriate case. Defense counsel at trial acknowledged in opening statement that this was a very, there would be a lot of very technical evidence in this case, and in his summation, his very second sentence was, that this was a complex and complicated case. Had the defendant raised any issue about the practice, I'm sure it would have prompted the district court to make findings on the record that would support his decision. From all evidence on the record, both sides were amenable, acquiesced in this practice. The questions, there were 11 questions total. Eight of them were posed during the time that the defendant was on the stand, but only three of them were put to the defendant. There was a colloquy among the lawyers and the judge in which we agreed that five of them weren't meant for Mr. Brown. And so we submit that the district court appropriately permitted the juror questions and limited them in the way that this court had warned district courts to do in the Collins case. If there are no other questions, then thank you. Thank you very much. Mr. Jones. Your Honors, first, I just want to place on the record, when reviewing the brief, I realized I made a misstatement about some of these questions. On page 16, the two questions to Agent Stevenson I wrote were over Mr. Brown's objection. They were not. The counsel did not object to those. I just want to clarify that part of the brief, that there was no objection to those questions as well. Very briefly on that point, on the complexity issue, I mean, I think we have ad hoc reasoning, post hoc reasoning going on about, well, it should have been permitted because it was so complex. Well, it's post hoc because there wasn't an objection, right? That is also true, and that's why we're in a plein air world. But looking at the questions themselves, I think it does say something about that. There are only two questions which relate at all to computer topics. The rest are things like, can we see the Brown envelope? Why wasn't handwriting analysis done?  Why was Heather Daniels not a witness? Were there other out-of-order service orders? Kind of mundane things about the facts of Mr. Brown's testimony and his defense and his assertion as to why he was doing what he was doing. If it's kind of mundane, then why is it so prejudicial? I think I want to direct you to page, I guess, 38 of our brief, particularly the discussion of this issue in general by the Nebraska courts and the Mississippi courts, that it's difficult for jurors to be both active participants in the adversarial process embroiled in the questioning of witnesses and also be impartial fact-finders standing aside. And here you have clear evidence in the nature of the questions that these jurors have become active participants in the fact-finding process. They are searching out answers. Their job is not to do that. Their job is to sit, receive the evidence, and determine whether that evidence beyond reasonable doubt convicts Mr. Brown, particularly because there were so few of the Collins procedures employed. There was not a discussion about evidence. There was not a final instruction about how they should treat these questions. There was not an admonition as to how they should treat the questions that they asked versus their jurors. All of that prejudiced Mr. Brown as a whole, and we believe he's entitled to a new trial as a result. Unless there are other questions, we'll rest on our briefs. Thank you. Okay, thank you, counsel, for your arguments this morning. We really do appreciate them. The case will be submitted. I think that completes our morning calendar.